UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON TALAMANTES,<br><br>    Plaintiff,<br><br>    v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>    Defendant. | Case No. 24-cv-00789-RS<br><br>**ORDER GRANTING IN PART, DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This case centers on an employment dispute in which Plaintiff Aaron Talamantes claims Defendant Costco Wholesale Corp. unlawfully mistreated him due to certain disabilities and related requests for accommodations. Defendant moves for summary judgment, arguing Plaintiff fails to prove any disabilities or accommodation requests caused the averred misconduct. For the reasons explained below, the motion is denied in all respects except as to Plaintiff's bid for punitive damages, for which the motion is granted.

## II. BACKGROUND

### A. Plaintiff Starts Working for Defendant

Costco hired Plaintiff to work as a probationary front-end assistant at one of its warehouses in Sonoma County, California, on July 6, 2023. According to Plaintiff's deposition testimony, he pulled his manager Paul Trombley aside during an orientation held that same day to discuss his prior diagnoses with Post Traumatic Stress Disorder ("PTSD") and anxiety, as well as an ankle injury that previously required surgery. As to his ankle, Plaintiff testified that he told Trombley "I

1    had broken my ankle, so I do have some weight limits that I can lift, but there are plenty of things

2    that I can do, considering that's why I applied for a front-end position, not a stocking position

3    because it's less weight I need to lift." Alvarez Decl., Dkt. No. 30-1, Ex. A ("Ex. A") at 10; *see*

4    *also id.* at 13 (Plaintiff stating he told Trombley about having a plate with nine screws in his ankle

5    and then showed him a picture of the X-ray). As to his mental health, Plaintiff testified that he

6    told Trombley he would need the accommodation of being able to take short breaks during panic

7    attacks caused by his PTSD. Trombley responded to the news by saying "thank you for your

8    service." *Id.* at 9–10. Plaintiff then explained that he was not in the military; his PTSD stemmed

9    from early childhood trauma. *Id.* at 10–11. Plaintiff claims Trombley told him "[n]ot to tell

10   anybody in upper management" and "to talk to him directly" if he had any problems. *Id.* at 11.

11   Plaintiff offered to provide medical documentation of his disabilities, but Trombley allegedly told

12   him that it was unnecessary. *Id.* at 12.

13        Defendant disputes that this entire conversation occurred. Trombley denies that Plaintiff

14   told him about the ankle or the PTSD on the day he was hired. *See* Alvarez Decl., Dkt. No. 30-1,

15   Ex. B ("Ex. B") at 87–88 (Trombley stating that Plaintiff "never told me that he had PTSD in my

16   time working with him" and swearing "I would not have said" to not tell anyone else); *see also id*.

17   at 98 (Trombley describing when he learned about the ankle injury). According to Trombley,

18   Plaintiff only revealed the ankle injury after re-injuring it in late August and that Plaintiff only

19   revealed the PTSD in late September, after the decision to terminate him had already been

20   reached. *Id.* at 99, 88.

21        Whatever happened on July 6, both sides agree that date marks the start of Plaintiff's time

22   at Costco, during which he worked at both the "front end," helping to box up purchased items and

23   gather carts in the parking lots, and in the tire shop, checking pressures and handling rotations.

24   Plaintiff asserts that his supervisor in the tire shop was named Will, and that his supervisors in the

25   front end included another person also named Will as well as a person named Noella. Trombley

26   agrees that the tire shop supervisor was Will Taylor, but he testified that no front end supervisor

27   named Will worked at Costco during Plaintiff's employment.

United States District Court
Northern District of California

**B. Defendant Reviews Plaintiff's Performance**

On July 28, 2023, Plaintiff received his 30-day performance review and signed off on having discussed it with Trombley. *See* Ex. A at 78–79 ("30-Day Review"). The review featured positive feedback, including that Plaintiff "has good member service," "doesn't engage in idle chatter," "always remembers to comes [sic] to work dressed professionally and ready to help our members," "has good communication," "has a good sense of teamwork," "takes responsibility for his actions," "is respectful of Company property and is honest and has demonstrated good judgment" and "responds well to flexibility." *Id.* Negative feedback included the note that "he may not fully understand what is expected of him. You must be constantly moving . . . Always stay busy . . . Never just be standing at the register waiting for a member to come up," and "We would like to see him now start to show more of a will to learn, by beginning to seek out other opportunities that may be available to him, such as cross training in another department." *Id.* The review also noted Plaintiff had one absence and two tardies. *Id.* Plaintiff apparently discussed this review with coworkers and determined that many of their evaluations were nearly identical. However, according to Katelin Lowell, a payroll clerk, the reviews are very tailored to the individual employee. She described Plaintiff's 30-day review as not objectively negative—"these comments are to let the employee know what they could work better on." Setyan Decl., Dkt. No. 31-1, Ex. 2 ("Lowell Tr.") at 48.

A few weeks later, Will Taylor in the tire shop filled out a notice to document three instances in which Plaintiff was tardy: 27 minutes late on July 18 (which predated the 30-day review described *supra*), 6 minutes late on August 15, and 4 minutes late coming back from lunch on that same day.   Plaintiff and Taylor both signed the form to confirm that it was discussed.

Plaintiff received a 60-day performance review on August 26. Ex. A at 80–82 ("60-Day Review"). Probationary employees only "rarely" receive such a review, Lowell testified, usually in cases where their performance hasn't improved. Like Plaintiff's prior review, the 60-day review detailed both positive and negative aspects of his work: he smiles and thanks the members,

but he needed "to focus on keeping conversations strictly business related." *Id.* The review advised Plaintiff to "always communicate with your team in a positive manner with your co-workers and management team" and to "[w]ork on asking Will, and the tire shop supervisors on what needs to be done daily." *Id.* Plaintiff had by then expressed interest in cross training and begun working in the tire shop, but the review stated he needed to improve his "sense of urgency." *Id.* The review also highlighted the counseling notice and stressed the importance of being on time; it identified one absence and four tardies, though it is unclear if that is cumulative (i.e., inclusive of the one absence and two tardies noted in the 30-day review). As with the 30-day review, Plaintiff and Trombley signed the document to confirm their discussion.

According to Plaintiff, he worked full-time shifts of eight hours, five days a week despite being only a temporary employee. Plaintiff also asserts that one of his tardies occurred after he helped an elderly customer in the parking lot on his way into work.

**C. Plaintiff Re-Injures Ankle On the Job And Receives Medical Leave**

Two days after the 60-day review, on August 28, Plaintiff reinjured his ankle when an assistant supervisor he identifies as Will required him to help lift a sectional couch. Setyan Decl., Dkt. No. 31-1, Ex. 1 ("Talamantes Tr.") at 70. Plaintiff claims he "kept explaining[,] [y]ou know, I can't do it . . . I have the plate and nine screws [in my ankle] . . . [but] the supervisor told me that it was part of my job description and that I had to do it." *Id.* Fearing he might lose his job, Plaintiff acquiesced to the task and immediately "felt a compression, a shift in my foot. My toes instantly turned purple and blue. I lost feeling." *Id.* Plaintiff told Will and an assistant general manager named Wendie Green about the injury, and although they advised him to go see a doctor, they refused to provide workers' compensation paperwork. *Id.* at 72. The next day, Plaintiff visited a nearby emergency room and received a note dated August 28, which stated "No lifting [sic] No heavy lifting until cleared by ortho or occupational health." Ex. A at 72 ("August 28 Note").

Plaintiff went straight to the warehouse with his doctor's note and showed it to Trombley and Green. Talamantes Tr. at 73. Green allegedly laughed at him and responded, "well, no heavy

lifting . . . with these accommodation recommendations, I don't have any job or position for you." *Id.*; *see also id.* at 58. Plaintiff requested a position checking for Costco membership cards at the door, having known another employee who got that job to accommodate an injury, but Green refused. *Id.* at 73–74. In a deposition, Trombley asserted that Costco requires all employees to be able to lift a minimum weight of 10 pounds such that no job existed for Plaintiff. Lowell testified in her own deposition that "when you say lifting, you could say lifting a piece of paper, lifting a pen, or it could really mean anything." Alvarez Decl., Dkt. No. 30-1, Ex. C ("Ex. C") at 123. Because the note was itself ambiguous about whether Plaintiff should refrain from lifting or specifically heavy lifting, Lowell emailed Costco's internal integrated leave team on August 29 and explained "we felt we could not accommodate . . . and placed him on a [leave of absence]." Lowell Decl., Dkt. No. 30-3, Ex. A at 6. The integrated leave team responded on August 30 to state its agreement with the 30-day leave approach that Lowell already adopted. *Id.* at 5.

Within "a few days" of issuing Plaintiff's 60-day review on August 26—a time period which seems to envelop the injury incident on August 28—Trombley claims he told Lowell that he wanted to terminate Plaintiff. Ex. B at 103. Trombley testified that Plaintiff "was not understanding what sense of urgency was," "had member interactions that didn't go so hot," and exhibited an "inability to work well other employees." *Id.* at 104. Trombley further testified that he discussed Plaintiff's poor performance with his own supervisor Wendie Green "a number of times" between two weeks after Plaintiff started at Costco and the date of his 60-day review. *Id.* at 107. No assistant managers spoke to Trombley about Plaintiff's performance, however. *Id.* at 108. It is unclear from the record whether Plaintiff's ankle incident predated Trombley's decision to tell Lowell about wanting to terminate Plaintiff.

**D. Defendant Contemplates Terminating Plaintiff During Leave**

In an internal email dated September 6, Trombley said Plaintiff used Costco's hotline to speak with a nurse. Ex. C at 138. Trombley also spoke to the nurse and learned that Plaintiff's ankle injury needed to be classified as a work-related injury, notwithstanding his prior surgery, because he had re-aggravated it at work. *Id.* Plaintiff subsequently visited Costco's workers'

compensation doctor, who stated that the injury was, in fact, not work-related, in a note signed on September 7, 2023. Ex. A at 73 ("September 7 Note"). The doctor's note stated Plaintiff could "[r]eturn to full work/activity today," *id.*, but Lowell allegedly told Plaintiff that company policy required continuing his leave until the following pay period. Talamantes Tr. at 93. As a result, Plaintiff was not permitted to return to work until September 14. Lowell Tr. at 86.

The earliest documentation in the record about Costco's decision to terminate Plaintiff is a September 12 email in which Lowell identified Plaintiff as a potential termination. *See* Ex. C at 136. Lowell sent another email dated September 23 to Trombley, referencing prior discussions about Plaintiff's last day being scheduled for September 27. *Id.* at 137.

### E. Plaintiff Suffers PTSD Flashback and Seeks Accommodation

On September 24, one day after Lowell confirmed the date of Plaintiff's termination with Trombley, Plaintiff had a PTSD flashback on the job, triggered by an incident in which he called the police about an armed man outside the building. Talamantes Tr. at 54–55. His PTSD stems from early childhood exposure to gun violence, and the encounter with the armed man "scared the hell out of" him. *Id.* at 111–13. Trombley was not at work at the time of the incident, so Plaintiff asked "Will," his direct supervisor at the time, if he could "go do carts or take an early break or something to clear my mind." *Id.* at 54. It is not clear whether Plaintiff is referring to Will Taylor in the tire shop or the "Will" he remembers as working in the front end (and whose very existence Defendant disputes). At any rate, Will did not permit Plaintiff to take a break; when Plaintiff tried to explain about the PTSD and asked if Trombley had mentioned it, Will said "what are you talking about?" *Id.* at 55. Will then suggested that PTSD must derive from combat experience; when Plaintiff explained that his condition stemmed from early childhood development, Will allegedly "just laughed and said everybody has problems as kids." *Id.* Plaintiff persisted in requesting an accommodation, during which time Will apparently whispered with another employee and laughed at him. *Id.* at 56. After approximately fifteen minutes, someone came to relieve Plaintiff, and he was able to calm down from his panic attack. *Id.*

The same day as the attack, Plaintiff spoke to Lowell about his condition. He presented a

2019 doctor's note that explained he had a service dog, seeking to use it to prove his PTSD. Ex. A at 74–75 ("2019 Note"); Lowell Decl., Ex. C at 10 (email dated September 24 from Lowell to integrated leave department about Plaintiff's note). He asked Lowell if maybe he could bring the service dog to the property, but Lowell allegedly responded "absolutely not." Talamantes Tr. at 49. Another co-worker overheard the conversation and allegedly joked, "Hey, can I bring my pet fish to work?" *Id.*

Lowell contacted the integrated leave and accommodation department about Plaintiff's PTSD note and learned that the request needed to go through management and legal before processing. Lowell Decl., Ex. C at 10. Lowell noted in response that "we had already made the decision to separate employment" before receiving the note. *Id.* She subsequently spoke with several managers—including Will Taylor—and learned Plaintiff had never discussed PTSD or anxiety issues with them. *Id.* Plaintiff has since testified that "I didn't tell anybody because I was afraid to, because I didn't want the upper management to find out if I had said anything" after Trombley's orientation-day warning. Talamantes Tr. at 121.

### F. Defendant Terminates Plaintiff

Costco terminated Plaintiff on September 27, 2023 "for work performance unsatisfactory." Ex. A at 77. Plaintiff recalls that, after emailing his PTSD note to Lowell, he was told there would be a meeting with higher management to discuss accommodations. *See* Talamantes Tr. at 102–03. When he returned to work after a couple days off, however, "as soon as I entered the room, the only thing [Trombley] said was we're cutting ties. And that was it." *Id.*

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotation marks omitted).

After the moving party meets its burden, the nonmoving party must bring forth material facts, or "facts that might affect the outcome of the suit under the governing law" to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 520 (1991). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). If the moving party meets its burden and the nonmoving party fails to raise a genuine question of material fact, then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23.

## IV. DISCUSSION

Plaintiff's complaint states five claims under California's Fair Employment and Housing Act—disability discrimination, retaliation, failure to prevent discrimination or retaliation, failure to accommodate disability, and failure to engage in a good faith process—as well as a common law wrongful termination claim and a bid for punitive damages.

### A. Disability Discrimination, Retaliation, and Failure to Prevent Both

"A prima facie case of disability discrimination under FEHA requires the employee to show he or she (1) suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was subjected to adverse employment action because of the disability." *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 378 (2015) (citing *Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007)). "Once the employee establishes his or her prima facie case, 'the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *Deschene v. Pinole Point Steel Co.*, 76 Cal. App. 4th 33, 44

(1999)). "To avoid summary judgment, the employee must then 'offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.'" *Reeves v. MV Trans., Inc.*, 186 Cal. App. 4th 666, 673–74 (2010) (quoting *Hersant v. Dep't of Soc. Serv.*, 57 Cal. App. 4th 997, 1004–1005 (1997)). This same burden-shifting schema applies to retaliation claims, *see Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005), as well as those averring a failure to prevent discrimination and retaliation, *see Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998). In the retaliation context, however, plaintiffs establish their prima facie case, not by showing adverse action due to a disability, but rather by showing adverse action caused by a protected activity. See *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467, 476 (1992).

Defendant moves for summary judgment, contending that Plaintiff falters on the third prong of his prima facie case in all three claims because he cannot prove that any averred disability or protected activity caused any adverse employment action.[1] To bear this burden, Plaintiff's complaint raises two distinct disabilities for which he took the protected action of requesting accommodations: (1) an ankle injury he re-aggravated on the job, and (2) correlated diagnoses of PTSD and anxiety that predate his employment with Defendant. Defendant also argues that it had legitimate, non-discriminatory or non-retaliatory reasons to fire Plaintiff and that Plaintiff fails to rebut those reasons.

   *1. Ankle*

As to the ankle, Plaintiff expressly testified that he told the hiring supervisor, Trombley, about a prior surgery (as well as his PTSD/anxiety, discussed *infra*) that would limit his ability to lift heavy loads. Notwithstanding that disclosure, he testified that he was forced to handle weight

---

[1] At oral argument and in its reply brief, Defendant argued that Plaintiff waived his retaliation claim by not rebutting, in his opposition brief, certain arguments Defendant made in its motion. No such waiver occurred; Plaintiff plainly argued that "genuine issues of disputed fact relating to Costco's . . . retaliation" precluded the granting of Costco's motion. *See* Dkt. No. 31 at 1.

ORDER GRANTING IN PART, DENYING IN PART SUMMARY JUDGMENT
CASE NO. 24-cv-00789-RS
9

that exceeded his abilities and ended up re-injuring the ankle while lifting a couch on August 28, 2023. The incident led to an emergency room visit, and when he returned with a note instructing "No lifting No heavy lifting," Costco placed him on medical leave, which he contests as both unnecessary and overly long, in part because he was cleared to work on September 7 but not scheduled to do so until September 14. During his leave, Lowell sent an email asking if Costco was planning to terminate him and received the green light to do so.

Defendant, of course, has a different story: Trombley says that the first he heard of the ankle injury was only after Plaintiff re-injured it. Costco apparently requires all employees to be able to lift up to 10 pounds and so placed him on leave until a doctor provided authorization for him to return to work. Trombley asserts he had already discussed Plaintiff as a candidate for termination weeks before the injury even happened.

These differences in the parties' factual accounts require denying Defendant's summary judgment motion. For one thing, a reasonable factfinder could yet determine that Defendant's medical leave was longer than necessary, amounting to an adverse action because of Plaintiff's disability. More critically, Plaintiff says he told Trombley about his disability and need for accommodations in July, whereas Trombley claims he didn't know about the ankle until after it was already re-injured in August. These disputes and others like them foreclose summary judgment.

To be sure, Defendant may avoid liability by presenting legitimate reasons for the firing, especially Plaintiff's repeated tardies and the claims about his unprofessional conversations. Again, however, Plaintiff has presented sufficient evidence to find disputes of fact in that regard too—i.e., contending that his performance reviews were largely positive, that he was given additional responsibility at work, and that he was working full-time hours. Crucially, the dispute as to whether Trombley knew about the ankle informs the extent to which the negative aspects of the reviews can support Defendant's burden. Plaintiff, as the nonmovant here, is entitled to the inference that perhaps Trombley *did* know about the injury from the jump, and thus was faulting Plaintiff for tardiness as a pretext. Whether that inference wins out is ultimately for the fact-finder to decide. At bottom, this case is a he-said, it-said between employee and employer—one which

requires a jury to apply the preponderance of the evidence standard to reach a judgment. Defendant cannot wave away Plaintiff's detailed testimony simply because it is uncorroborated. *See Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 498 (9th Cir. 2015) (reversing grant of summary judgment where "deposition testimony, albeit uncorroborated and self-serving, w[as] sufficient to establish a genuine dispute of material fact").

Defendant urges a different conclusion, highlighting the substantial evidence standard that Plaintiff must meet to prove pretext. *See Reeves*, 186 Cal. App. 4th at 673–74. Under that standard, a plaintiff averring disability discrimination under FEHA survives summary judgment only if he can "[d]emonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the] proffered legitimate reasons for [the] action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 674 (internal quotation marks and citations omitted). Here, Plaintiff does so. The record indicates several inconsistencies in Defendant's proffered reasons for firing him such that a rational juror could find them incredible. Most notably, the earliest evidence of Defendant's decision to fire Plaintiff post-dates his ankle injury, and Trombley testified that the decision was within a few days of the 60-day review (that was only two days before the ankle injury). The doctor note's specific reference to "no heavy lifting" went ignored when Defendant decided Plaintiff could not do any job at all. Moreover, Plaintiff says he told Trombley about his need for accommodations before any performance review issued, introducing the possibility that any negative components of the review might be pretextual.

It also bears mentioning that the substantial evidence standard only applies to the claim that an asserted nondiscriminatory reason was untrue or pretextual—if Plaintiff's rebuttal is that the employer acted with a discriminatory animus, the standard is only "evidence." *Id.* Moreover, Plaintiff could even present "a combination of the two" and meet his burden so long as "a reasonable trier of fact could conclude the employer engaged in intentional discrimination." *Id.* at 673. Here, Plaintiff has introduced evidence that his supervisors laughed at him for requesting a no lifting accommodation and then sidelined him for longer than Costco's own doctors thought necessary. When combined with his evidence of pretext, this evidence of animus is enough for a

reasonable juror to conclude that Defendant engaged in intentional discrimination. "[I]t should not take much for plaintiff in a discrimination case to overcome a summary judgment motion . . . because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Nigro*, 784 F.3d at 499 (internal citations and quotation marks omitted). Summary judgment is therefore denied with respect to the ankle-related aspects of Plaintiff's claim.

*2. PTSD and anxiety*

As to Plaintiff's PTSD/anxiety, Defendant's motion fails for the same reasons. There remains a genuine dispute of fact about whether Trombley knew about those issues at the time he instigated Plaintiff's termination proceedings. Numerous disputes flow from there: whether Plaintiff's requests for accommodation were reasonably implemented (or ignored, as he contests); whether Plaintiff was harassed and ridiculed for having his condition, as he alleges; whether Defendant's asserted reasons for terminating him were pretextual, etc. Defendant's answer to all of these seems to be that Plaintiff has no evidence that he informed Costco of his disabilities because his testimony stands alone. In light of Plaintiff's claim that Trombley *told* him (1) not to provide medical documentation and (2) not to tell anyone in upper management about his accommodation requests, if true, it would be patently unfair to fault him now for lack of additional proof. "[I]f direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) (citing *Matsushita*, 475 U.S. at 587; *Cities Serv.,* 391 U.S. at 289). In this instance, Plaintiff's sworn testimony conflicts with Trombley's sworn testimony. Defendant contends that, because Trombley denies Plaintiff's allegations, Plaintiff cannot prove he disclosed his disabilities when he was hired without any factual evidence or witnesses to support his version of events. This argument, however, would lead to a conclusion the court cannot reach. *See Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009) ("A judge must not grant summary judgment based on his determination that one set of

facts is more believable than another.").

### B. Failure to Accommodate Disability

FEHA requires employers to make reasonable accommodation for the known disability of an employee unless it would produce undue hardship to the employer's operation. *See* CAL. GOV'T CODE § 12940(m) (West 2025). "The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability." *Nealy*, 234 Cal. App. 4th at 373 (citing *Wilson v. County of Orange*, 169 Cal. App. 4th 1185, 1192 (2009); *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 977 (2008)).

Defendant contends that Costco reasonably accommodated Plaintiff's ankle, once again claiming that nobody knew about the ankle until after it was re-injured. As explained *supra*, Plaintiff has presented a competing narrative in which Trombley knew about the injury but did not accommodate it, leading to the re-injury in August. This dispute of fact defeats Defendant's argument.

Defendant also suggests that it did not know about the PTSD and anxiety before deciding to terminate him. As just stated, Plaintiff's evidence is that Trombley did know and nevertheless refused to ensure his accommodation. The motion is therefore denied in this respect.

### C. Failure to Engage in Good Faith Interactive Process

"The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. Ritualized discussions are not necessarily required." *Wilson*, 169 Cal. App. 4th at 1195 (internal citation omitted). "[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). "Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation." *Gelfo v. Lockheed Martin Corp.*, 140

Cal. App. 4th 34, 62 n.22 (2006). "Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous." *Scotch v. Art Inst. of California*, 173 Cal. App. 4th 986, 1013 (2009).

This claim rests on Plaintiff's averment that Costco failed to discuss placing him in a different position after he disclosed his ankle injury and failed to discuss his requests for leaving the register or being able to go outside when suffering the panic attacks that come with his PTSD and anxiety. As in its other arguments, Defendant asserts that this claim fails as a matter of law because it accommodated the ankle injury as soon as it learned about it. Necessary to this conclusion is the disputed premise that Defendant did not know about the injury on the day it hired Plaintiff, as Plaintiff testified. The same holds true with respect to PTSD and anxiety; Defendant cannot erase the testimony that it knew about those conditions, notwithstanding how inconvenient that testimony is for its position. The motion is therefore denied.

### D. Wrongful Termination

Defendant argues that Plaintiff has no evidence Costco violated FEHA at any time and thus, that his wrongful termination claim fails. However, for the reasons already explained *supra*, Plaintiff *does* have evidence that Costco may have violated FEHA. This argument therefore fails to persuade. The motion is denied with respect to Plaintiff's wrongful termination claim.

### E. Punitive Damages

To prove a claim of punitive damages, Plaintiff must present clear and convincing evidence of "oppression, fraud, or malice" by Costco's management. *See* CAL. CIV. CODE § 3294(b); *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 576–77 (1999). A finding of malice or oppression requires despicable conduct "so vile, base, contemptible, miserable, wretched, or loathsome it would be looked down upon and despised by ordinary decent people." *Am. Airlines v. Sheppard Mullin*, 96 Cal. App.4th 1017, 1050 (2002) (internal quotation marks and citation omitted). Intentional discrimination, standing alone, is generally insufficient to establish entitlement to punitive damages. *See Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, *as amended*, 156 F.3d 988 (9th Cir. 1998).

Defendant contends that Plaintiff fails to provide any evidence that rises to the high standard of vile wretchedness as required for the awarding of punitive damages. In opposition, Plaintiff highlights the way that Trombley allegedly told him not to disclose his disabilities; the fact that he was forced to lift the couch over his objection and then mocked for having childhood-related PTSD; and the fact that he was laughed at when he requested a no heavy lifting accommodation for his ankle.

Although this evidence suffices to create a triable issue of material fact as to the complaint's causes of action, it is insufficient to support Plaintiff's claim for punitive damages. On the current record, a reasonable juror could not find the sort of "loathsome" conduct that would be "despised by ordinary decent people." *Am. Airlines*, 96 Cal. App. 4th at 1050. Thus, with respect to Plaintiff's bid for punitive damages, Defendant's motion for summary judgment is granted.

### V. CONCLUSION

Considering the numerous disputes of material facts that remain at issue in this case, and for the reasons explained *supra*, Defendant's motion for summary judgment is denied in all respects except as to Plaintiff's bid for punitive damages, for which the motion is granted.

**IT IS SO ORDERED**.

Dated: June 27, 2025

_____
RICHARD SEEBORG
Chief United States District Judge